IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|                                          |   |                  |
|------------------------------------------|---|------------------|
| NANCY GRIFFIES,                          | : | C.A. 10-546-RGA  |
| Plaintiff,                               | : |                  |
|                                          | : |                  |
| v.                                       | : |                  |
| MICHAEL J. ASTRUE,                       | : |                  |
| Commissioner of Social Security,         | : |                  |
| Defendant.                               | : |                  |

## **MEMORANDUM OPINION**

---

John S. Grady, Esq., Dover, Delaware; Attorney for Plaintiff Nancy Griffies.

Eric P. Kressman, Esq., Philadelphia, Pennsylvania; Michelle Scotese, Esq., Philadelphia, Pennsylvania; Patricia A. Stewart, Esq., Philadelphia, Pennsylvania; Attorneys for Defendant Michael J. Astrue, Commissioner of Social Security.

---

April 11, 2012

Wilmington, Delaware

1

ANDREWS, United States District Judge:

Plaintiff Nancy Griffies appeals the decision of Defendant Michael J. Astrue, the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act and supplemental security income ("SSI") under Title XVI of the Social Security Act. This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Pending before the Court are cross-motions for summary judgment filed by Griffies and the Commissioner. Griffies' motion for summary judgment asks the Court to award her DIB. The Commissioner's cross-motion for summary judgment requests that the Court affirm his decision and enter judgment in his favor. Griffies' motion for summary judgment will be granted in part and denied in part, and the Commissioner's cross-motion for summary judgment will be denied. This matter will be remanded for further proceedings.

## I. BACKGROUND

### A. Procedural History

Griffies first filed her application for DIB and SSI in 2005. Tr. at 15. That application was denied both initially and upon reconsideration. After a requested hearing, an administrative law judge ("ALJ") issued a decision denying benefits. The Appeals Council upheld the ALJ's decision after Griffies requested review. Griffies filed an appeal to this Court.

Upon request of the Appeals Council, this Court remanded the case for further proceedings. Griffies v. Astrue, Civ. Act. No. 08-19-GMS. The Appeals Council vacated the decision, and returned the case to the ALJ.

After a second administrative hearing, the ALJ again denied Griffies' application for benefits. The Appeals Council affirmed this decision, which became the final order of the agency. Griffies then filed a Complaint seeking judicial review of the ALJ's second decision.

### B. Factual Background

#### 1. Griffies' Disability Application

2

Griffies was born in 1965. She was thirty nine years old at the time of her applications. Tr. at 100. She is a high school graduate and attended approximately one year of college. Tr. at 49. She had been employed in various clerical positions and as a bank teller prior to her alleged disability. Tr. at 71. In her application for benefits, Griffies claimed she became disabled on March 12, 2004 due to fibromyalgia, severe depression, irritable bowel syndrome, and migraine headaches. Tr. at 104. Griffies indicated she has trouble concentrating, is incapable of lifting more than 10 pounds, and that squatting, bending, standing, reaching, walking, and sitting for periods of time cause pain. Tr. at 130-31.

### 2. Griffies' Medical History

Griffies' medical record begins with treatment from Dr. Lynn Romano, M.D., a general practitioner, starting in January 2003. Tr. at 189. The record reflects that Dr. Romano treated Griffies for numerous symptoms that evaded initial diagnosis, including muscular spasms, headaches, insomnia, depression, and anxiety. Tr. at 179, 182-84, 188-89. Dr. Romano prescribed multiple medications with limited success and ordered an MRI on Griffies' spine that showed no serious structural problems. Tr. at 180. After suspecting fibromyalgia as the cause of Griffies' symptoms, Dr. Romano referred Griffies to Dr. Ivonne Herrera, a rheumatologist, for specialized treatment in May 2004. Tr. at 234-36.

Dr. Romano continued treating Griffies after this referral. She submitted a "Physical Residual Functional Capacity Questionnaire" ("Questionnaire") with medical reports to the Department of Disability Services ("DDS") in October 2006. Tr. at 326-30. The Questionnaire chronicled Griffies' history of pain, symptoms, diagnosis, and treatment. Tr. at 327-30. It also contained physical and employment limitations consistent with a finding of disability. Tr. at 330. Dr. Romano continued treating Griffies through 2009 and that year completed a "Physician's Statement" indicating Griffies' medical status had worsened since 2006. Tr. at 455.

Griffies followed the referral and was treated extensively by Dr. Herrera from May 2004 through 2009. Tr. at 219, 234-36. Dr. Herrera diagnosed fibromyalgia as the chief cause of Griffies' ailments. Tr. at 295, 299, 327, 443, 461. Through treatment, Dr. Herrera took consistent pain reports and observed

3

symptoms of back and neck pain, fatigue, insomnia, depression, and anxiety. Tr. at 222-31, 313-16, 436-43, 453, 461. Dr. Herrera observed Griffies' symptoms as non-responsive to more than ten medications and suggested alternative measures for pain relief, including yoga, acupuncture, cognitive therapy, and relaxation techniques. Tr. at 316, 443. Griffies initially resisted these alternative treatments; she did attempt cognitive and physical therapy before rejecting them, and found the recommended exercises prohibitively painful. Tr. at 432, 435, 454.

Like Dr. Romano, Dr. Herrera submitted a Questionnaire, with medical records, to the DDS in September 2006. Tr. at 295-316. Dr. Herrera detailed Griffies' fibromyalgia symptoms and treatment, outlined severe physical limitations in day to day activities, and rated her pain generally between 7/10 and 10/10. Tr. at 295-98. The Questionnaire indicated that Griffies would miss work more than four days a month due to her symptoms. Tr. at 297. If credited, Dr. Herrera's opinion would support a finding of disability. Tr. at 73-74. Dr. Herrera also submitted a second "Physician's Statement" in May 2009, finding that Griffies' condition had worsened. Tr. at 478.

Griffies also saw Dr. Kartik Swaminathan, a pain management specialist. Tr. at 318. He diagnosed back spasms and treated her back pain with cervical epidural injections, while declining to prescribe her narcotic pain medication. Tr. at 318.

DDS consulted Dr. Michael Borek, D.O. Dr. Borek never treated Griffies, but on Sept. 4, 2005 completed a "Physical Residual Functional Capacity Assessment" ("Assessment") based on her existing medical record. Tr. 275-284. The bulk of Dr. Borek's Assessment consists of checked boxes.[1] Dr. Borek's conclusions conflicted with those of Griffies' treating physicians and indicated physical limitations consistent with light and sedentary employment.[2] Tr. at 283. Dr. Borek checked boxes to state that Griffies' symptoms were "partially" disproportionate to his expectations of severity. Tr. at 280. Likewise,

---

[1] Dr. Borek checked the box stating that the treating doctor's "conclusions about the claimant's limitations or restrictions" were not "significantly different" from his. Tr. at 281.
[2] The written analysis by Dr. Borek is: "Sum: The clmt. has MDI which could cause dysfunc.; the alleged magn. of physical dysfunc. is partially credible as P/E's a w/u are not remarkable; the Psyc. Obs's are sign. I believe the max RFC is for light, which is fully c/w TSD." Tr. at 282.

4

he stated that the "severity of the symptom[s]" was "partial[ly]" consistent with all the medical and non-medical evidence. Tr. at 280.

Griffies received specialized treatment for her mental health problems. She saw Dr. Jeanette Zaimes, M.D., a psychiatrist, seven times in 2004 and 2005. Dr. Zaimes diagnosed Griffies with "major recurring depressive affective disorder of a moderate degree with obsessive compulsive disorder" and prescribed Griffies multiple anti-depressive medications before Griffies ended treatment. Tr. at 205-13.

Dr. Joseph Keyes, Ph.D., a psychologist, conducted a consultation for Griffies in August 2005. Tr. at. 252. Dr. Keyes diagnosed Griffies with "major depressive disorder recurrent chronic, moderate to severe" and assigned a "Global Assessment Functioning" score of 55-60. Tr. at 254. Dr. Keyes found that Griffies' impairments "seriously affect[ed her] ability to function" in regard to "cop[ing] with pressures of ordinary work, i.e. meeting quality and production norms," and in regard to her "ability to relate to other people." Tr. at 255-56. He also found impairments "affect[ed] but [did] not preclude ability to function" in regard to her ability to perform routine, repetitive tasks under ordinary supervision and to "sustain work performance and attendance in a normal work setting." Tr. at 256.

The DDS hired Dr. Christopher King, M.D., a psychiatrist, to review Griffies' psychological medical history and complete a "Psychological Residual Functional Capacity Assessment" in September 2005. Tr. at 257. Like Dr. Borek, he only partially credited Griffies' statements regarding her ailments. Tr. at 273. Dr. King concluded Griffies suffered from the severe impairment of "major depression," but that she retained the mental capacity to perform simple, repetitive tasks. Tr. at 273.

### 3. The First Administrative Hearing

Griffies' first administrative hearing was held in December 2006. Tr. at 42-75. Griffies testified about her symptoms and treatments related to her fibromyalgia. Tr. at 53-58. She rated her pain as 8/10 and did not see herself returning to work in the future. Tr. at 54. Her symptoms did not respond to the many medications she tried with her doctors. Tr. at 56. Griffies testified about her psychological treatment and severe depressive symptoms, including anxiety and insomnia. Tr. at 58-62. She had severe limitations

standing and sitting in place at one time, trouble kneeling and bending, and cannot lift objects above ten pounds, although she did not have problems using her hands or breathing. Tr. at 62-64. She generally had problems doing day to day chores and activities without assistance, although she could drive for short distances, take care of her finances, read, and go to church or social clubs. Tr. at 66. She had no personal income. Tr. at 67. Her last job was at her dry cleaners, where she was required to carry clothes weighing five to ten pounds. Tr. at 68. Pain caused her to quit this job. Tr. at 68. Her back, neck, and shoulder pain was constant, and the fibromyalgia medications only partially eased her pain. Tr. at 68.

The ALJ asked the testifying vocational expert about a hypothetical person with functional limitations consistent with the ALJ's evaluation of Griffies' medical records. Tr. at 70-74. The expert opined that such a hypothetical person would be limited in returning to her previous skilled and semiskilled work. Tr. at 71-72. The expert did find, however, that suitable positions existed in the category of unskilled and light sedentary work for the person to find gainful employment. Tr. at 72. The expert agreed with Plaintiff's counsel that if the RFC Questionnaires from Drs. Romano and Herrera were accurate, no positions would be available to the hypothetical worker, due to the doctors' conclusions that Griffies would be absent from work more than four times a month. Tr. at 73. The expert also agreed that the physical limitations in these Questionnaires precluded employment. Tr. at 73-74.

### 4. The Second Administrative Hearing

The second administrative hearing was held after remand, in May 2009. Tr. at 481-502. Counsel agreed with the ALJ's suggestion that supplemental vocational expert testimony was not required. Tr. at 497-98.

At the second hearing, Griffies stated that her pain symptoms from the fibromyalgia were still present, treatment had not helped, and changes in medication were ineffective. Tr. at 487. She tried Cymbalta, Oxycodone, Valium, Xanax, and Soma for the Fibromyalgia. Tr. at 487. Dr. Herrera provided her care, and "nowadays" her pain levels were rated at 8 out of 10 with medication. Tr. at 487. She took Cymbalta for her depression. Tr. at 487. There was no improvement in her depression or anxiety. Tr. at 488. Griffies still had difficulties with insomnia and had severe limitations walking, standing, and lifting

6

without discomfort. Tr. at 489. She spent most of her days home, resting and reading, and could not work due to her fibromyalgia. Tr. at 490. She had problems with stiffness in her hands and lived with her ex-husband, son, and daughter, who all helped with daily chores. Tr. at 490-91. Griffies testified as to her mental health problems, including anxiety attacks and depression. Tr. at 493. She saw a counselor twice a month. Tr. at 491. Griffies had both good days and bad days, but the bad days occurred up to three times a week, and on the bad days she could not get out of bed. Tr. at 492-93.

Griffies testified that problems with her hands were new. Tr. at 493. Griffies admitted she could button and zip her clothing, hold a comb, make a grocery list, hold a cup or plate, open a jar, and drive. Tr. at 494. She was capable of taking care of personal and bathroom hygiene. Tr. at 495. Her family did the cooking, but she could make herself a sandwich and use the microwave. Tr. at 495. Social outings were not comfortable for Griffies. Tr. at 495. She got along well with her family members most of the time and her ex-husband did the shopping. Tr. at 496.

Two ex-husbands testified on her behalf. Jeff Griffies testified he had been in regular contact with Griffies since 2004. Tr. at 499. They divorced in 2006. Tr. at 499. His visits with Griffies lasted around one half hour. Tr. at 499. He testified that Griffies was incapable of completing physical activities. Tr. at 499. She was incapable of finishing the simplest of tasks because of her pain. Tr. at 499-500. After an hour of light work she had to lie down. Tr. at 500. He testified that during their phone conversations Griffies was always lying down. Tr. at 500. The pain in her legs made walking impossible at times and her shoulders and arms were pained. Tr. at 500. He saw no improvement over the past four or five years. Tr. at 500. He testified that at her last job she went to the hospital twice via ambulance for panic attacks. Tr. at 500. He concluded that Griffies was absolutely incapable of work. Tr. at 501.

David Francis is Griffies' first ex-husband. Francis testified that they were married from 1992 through 2000. He stated he has been her "right arm" and a part of her life since 2004. Tr. at 501. He testified she was "ten times worse than in 2004" and has been getting worse through the years. Tr. at 501.

## II. THE ALJ'S DECISION

## A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). In order to qualify for DIB, the claimant must establish that he or she was disabled prior to the date he or she was last insured. *See* 20 C.F.R. § 404.131; *Matullo,* 926 F.2d at 244.3 A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3). A claimant is disabled "only if her physical or mental impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel,* 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. If the claimant is engaged in substantial gainful activity, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. If the claimant is not suffering from a severe impairment or combination of impairments that is severe, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

---

If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer,* 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform past relevant work. *See* 20 C.F.R. § 404.1520(a)( 4)(iv); *Plummer,* 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by her or her impairment(s)." *Fargnoli v. Massanari,* 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer,* 186 F.3d at 428. If the claimant is able to return to her past relevant work, the claimant is not disabled.

If the claimant is unable to return to past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer,* 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See id.* In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

9

**B. The ALJ's Decision**

The ALJ rejected Griffies' claim for DIB on October 19, 2009. Tr. at 376-407. The ALJ

conducted the five-step sequential analysis in rejecting Griffies' claim. The ALJ found Griffies satisfied

the first step as Griffies was not engaged in a "substantially gainful activity," i.e. not employed during the

disability period. Tr. at 382. The ALJ then considered the second step of whether the alleged impairments

were "severe." Tr. at 382. The ALJ held that Griffies' fibromyalgia, depression, anxiety, and chronic

fatigue syndrome were "severe." Tr. at 382. The ALJ held, however, that Griffies' chronic headaches,

cervical pain, and carpal tunnel syndrome were "not severe" and could not support a finding of disability.

The ALJ's holding as to those ailments was:

> As there is no evidence that the claimant's cervical pain, irritable bowel syndrome,
> restless leg syndrome, carpal tunnel syndrome or headaches have more than a minimal
> effect on her ability to perform basic work activities, the undersigned finds that these
> impairments are not severe within the meaning of the Social Security Act.[4]

Tr. at 393. The ALJ continued the sequential process in regards to Griffies' fibromyalgia, depression,

anxiety, and chronic fatigue syndrome. In the third step, the ALJ determined that none of these

impairments met or medically equaled one of the listed impairments that presume disability in 20 C.F.R.

§ 404.1520(a)(4)(iii). Tr. at 393. In the fourth step, the ALJ determined that Griffies was incapable to

return to her former employment as either an administrative clerk or bank teller. Tr. at 405.

The major dispute between the parties pertains to the fifth step. The ALJ concluded that Griffies'

fibromyalgia, depression, anxiety and chronic fatigue syndrome did not limit her functionality so as to

preclude her from adjusting to a new type of available work.[5] The ALJ's holding was:

---

[4] Griffies does not appeal the ALJ's determination that her irritable bowel syndrome and restless leg syndrome are not severe impairments.

[5] "The claimant has the 'residual functional capacity' to perform simple, unskilled, sedentary to light work as defined in 20 C.F.R. §§ 404.1567(a and b) and 416.967(a and b) except that she could lift up to 20 pounds occasionally, 10 pounds frequently, stand or walk for 6 hours in an 8 hour day and sit for 6 hours in an 8 hour day, occasionally climbing, balancing, stooping, kneeling, crouching and crawling, avoiding concentrated exposure to cold temperatures, vibrations and hazards, [with] only occasional contact with co-workers and the general public." Tr. at 397.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of 'not disabled' is therefore appropriate under the framework of the above-cited rule.

Tr. at 407.

## III. DISCUSSION

### A. The Arguments on Appeal

The ALJ determined that while Griffies was not capable of returning to her old job, she was capable of adjusting to less physically and mentally demanding work and therefore not disabled. Griffies presents five arguments why the ALJ's decision was wrong and should be overturned: (1) the ALJ erred at step two in finding Griffies' cervical, hand and wrist ailments, and her headaches, were not severe (D.I. 16, pp. 32-34; D.I. 20, pp. 13-14); (2) the ALJ erred in assigning little weight to the opinions of her treating physicians and great weight to the opinion of the non-examining physician (D.I. 16, pp. 15-24; D.I. 20, pp 1-8); (3) the ALJ erred in rejecting the testimony of Griffies, especially concerning her subjective complaints (D.I. 16, pp. 24-27; D.I. 20, pp. 9-11); (4) the ALJ improperly evaluated the mental and psychological impairments of Griffies (D.I. 16, pp. 27-30; D.I. 20, pp. 10-12); and (5) the testimony of the vocational expert does not show that there is any work Griffies could perform. (D.I. 16, pp. 30-32; D.I. 20, pp. 8-9).

### B. Standard of Review

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount

11

of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-particularly certain types of evidence (e.g., evidence offered by treating physicians)-or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Even if the reviewing court would have decided the case differently, it must defer to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## C. Analysis

### 1. The ALJ's determination that Griffies' cervical pain, carpal tunnel syndrome and headaches were not severe impairments was supported by substantial evidence.

At step two of the sequential disability determination analysis, the ALJ determined that Griffies did not suffer from severe headaches, cervical pain, and carpal tunnel syndrome. The Court finds this decision to be supported by substantial evidence. The ALJ was required to determine whether the claimant suffered from a severe impairment or a combination of impairments that is severe, based on the medical opinions and evidence. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

Griffies appeals the finding that her cervical pain was not severe. She first reported neck spasms and cervical pain to Dr. Romano in August 2003. Tr. at 183. She received an MRI in September 2003 that initially noted "probable hemangioma" at the T1 vertebrae and "no need for further evaluation." Tr. at

180. Griffies saw also Dr. Swaminathan for her cervical pain. Tr. at 318. Dr. Swaminathan diagnosed back spasms and observed that "facet loading" was painful, but declined to prescribe narcotics and noted "symptom magnification." Tr. 318. Griffies did testify to her cervical pain and was diagnosed with cervical disc disease and cervical strain and sprain by Dr. Romano in December of 2006. Tr. at 451. She received injections and reported normal range of motion in her spine.

The ALJ properly relied on the opinion of Dr. Swaminathan, a treating physician of Griffies, as well as the MRI results in determining that the cervical spine pain was not "severe." The MRI showed no significant damage to her back. Dr. Swaminathan's attitude towards Griffies' back does not seem to square with the treating of a "severe impairment," as he refused to prescribe narcotic medication. As Dr. Swaminathan was a treating physician, the ALJ properly relied upon his records in declining to judge the cervical pain a "severe impairment." The ALJ's finding is supported by substantial evidence.

Griffies also appeals the finding that her wrist pain was not severe. Dr. Herrera diagnosed Griffies with "possible carpal tunnel" syndrome on February 7, 2005. Tr. at 222. She was given a wrist splint at bedtime for treatment. Tr. at 223. Griffies does not cite any place in the record where she was actually diagnosed with carpal tunnel syndrome. Griffies testified at the second hearing that she experienced numbness in her hands, and that she was capable of basic day-to-day personal tasks using her hands. There is no objective EMG or nerve conduction study that supports a finding that Griffies had carpal tunnel syndrome. Based on the absence of a carpal tunnel syndrome diagnosis, and the lack of objective evidence indicating carpal tunnel syndrome, the ALJ's conclusion that carpal tunnel syndrome was not a "medically determinable impairment" was supported by substantial evidence.

Finally, Griffies appeals the finding that her headaches were not severe. Tr. at 392. Dr. Romano first diagnosed Griffies with headaches in January 2003. Tr. at 189. She received medication and an MRI that showed no significant problems. Tr. at 181. She also complained of headaches in May 2006 to Dr. Swaminathan. Tr. at 344. In the first administrative hearing, Griffies testified that she treated her migraine headaches with Butalbital and diazepam, and that the headaches occurred once or twice a month, last for

13

up to two days with medication, and respond to treatment. Tr. at 56. In May 2009 she testified that the headaches occur four to five times a month and she takes Midrin. Tr. at 486. The sporadic nature of the headaches, and the apparent effectiveness of medication to control the headache symptoms, provide substantial evidence for the ALJ's finding that they are not severe.

**2. The ALJ improperly assigned little weight to the opinions of the treating physicians.**

Griffies argues that the ALJ was mistaken in undervaluing the opinions of her treating physicians, Dr. Romano and Dr. Herrera, in determining the severity of her impairments. She also argues that the ALJ was wrong to give significant weight to the opinion of the non-treating physician hired by the DDS to review her claim.

The Commissioner responds that as a matter of law the RFC Questionnaires completed by Dr. Herrera and Dr. Romano are not medical opinions as defined by 20 C.F.R. § 404.1527(a)(2). The Commissioner contends that the RFC Questionnaires from Griffies' treating physicians should receive no greater weight than opinions from non-treating physicians. 20 C.F.R. §§ 404.1527(e)(3). The Commissioner also argues that Griffies' testimony contradicted the medical opinions of her own doctors.

The Commissioner claims that, as a matter of law, the RFC Questionnaires completed by Drs. Herrera and Romano are not medical opinions. The Commissioner cites the regulations:

Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(2); 20 C.F.R. § 416.927(a)(2). The Commissioner cites no cases interpreting this regulation to preclude considering RFC Questionnaires as medical evidence. The regulation defines medical opinions in an open-ended and non-restrictive manner. Moreover, Drs. Romano and Herrera did not merely supply Questionnaires without supporting documentation. Their opinions were amply supported with years of medical assessments, reports, notes, correspondences, and other documentation.

14

This is valid medical evidence due fair consideration by the ALJ. *See Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 662 (D. Del. 2008)

The Commissioner argues that because the Questionnaires contain opinions close to the core of a disability determination, they invade upon the territory of the Commissioner and must be disregarded. As explained below, while it is true that the ultimate decision of disability must rest with the Commissioner, that does not give the ALJ power to ignore properly submitted medical evidence, even in the form of Questionnaires containing some conclusions speaking to the final issue of disability.

The Commissioner cites 20 C.F.R.§§ 404.1527(e)(3) and 416.927(e)(3) for the proposition that evidence from Griffies' treating physicians deserve "no special significance." This is not what these regulations stand for. While it is true that the regulations state, "We will not give any special significance to the source of an opinion on issues reserved to the Commissioner," the "no special significance" is limited to "issues reserved to the Commissioner described in paragraphs (e)(1) and (e)(2) of this section."[6] The limitations are key to identifying the type of treating source opinion not given special significance. Paragraph (e)(1) of these sections explains the first part of this limitation:

> We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In doing so, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are 'disabled' or 'unable to work' does not mean we will determine that you are disabled.

20 C.F.R.§§ 404.1527(e)(1); 416.927(e)(1). Paragraph (e)(2) provides the second part of the limitation:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1

---

[6] The regulation in full: "We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (e)(1) and (e)(2) of this section." 20 C.F.R. §§ 404.1527(e)(3) and 416.927(e)(3).

15

> to this subpart, your residual capacity, or the application of vocational factors, the final
> responsibility for deciding these issues is reserved to the commissioner.

20 C.F.R.§§ 404.1527(e)(2); 416.927(e)(2). These sections highlight the truism in social security

law that no physician has the final say as to a claimants' eligibility for disability benefits. *See*

*Knepp v. Apfel*, 204 F.3d 78, 85 (3d Cir. 2000). That is the Commissioner's role. *Id.* While the

Commissioner must consider and weigh all medical opinions in making this determination, the

final responsibility for judging the nature and severity of impairments, residual capacity, and

applying the vocational factors lies with the Commissioner. *Gonzalez*, 537 F. Supp. 2d at 659.

Sections 404.1527(e)(3) and 416.927(e)(3) serve as a reminder that treating physicians are not

exempt from this rule. A treating physician's ultimate conclusion on the existence of a disability

is no more valuable than that of a non-treating physician, because both invade the territory of the

Commissioner's authority.

Not only is the Commissioner's argument contrary to the clear language of the regulations, it also

ignores established case-law in the Third Circuit. The Third Circuit follows the "treating physician

doctrine." *Gonzalez*, 537 F.Supp.2d at 659; *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). This

means that a court must give greater weight to the findings of a treating physician than to the findings of a

physician who has examined the claimant only once or not at all. *Mason*, 994 F.2d at 1067. When a

physician has treated a patient over an extended period of time, that physician's opinion should typically

be afforded great weight. *See Dass v. Barnhart*, 386 F. Supp 2d 568, 576 (D. Del. 2005). A treating

physician's opinion is then afforded "'controlling weight'" if it is "'well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence [in the claimant's] case record.'" *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). A final

disability determination must not conflict with an opinion deserving of controlling weight.

An ALJ may reject a treating physician's opinion "only on the basis of contradictory medical

evidence." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000). That opinion may not be rejected for no

reason or the wrong reason. *Id.* at 317. When there is contradictory medical evidence, the ALJ must

16

carefully evaluate how much weight to give the treating physician's opinion and provide an explanation as to why the opinion is not given controlling weight. *Gonzalez*, 537 F. Supp. 2d at 660.

Thus, even when the treating source opinion is not given controlling weight, it does not follow that it deserves zero weight; the ALJ must apply several factors in deciding how much weight to assign it. *Id.* These include the treatment relationship, the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion afforded by the medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician. *Id.* If an ALJ fails to conduct this analysis, a reviewing court cannot judge whether the ALJ actually considered all the relevant evidence, and the ALJ's decision cannot stand. *Id.*

### a. The ALJ did not adequately justify assigning Dr. Romano's opinions little weight.

The ALJ assigned little weight to Dr. Romano's opinions. The ALJ's basis for doing so was, for the most part, conclusory. The ALJ stated that her opinions were "inconsistent with the record," that Dr. Romano "[lacked] expertise in vocational training and occupational health," that she practiced general medicine, and that she had "not provided a balanced review of the claimant's limitations." Tr. at 404. The ALJ also took issue with Dr. Romano's heavy reliance on Griffies' subjective complaints, and found that her opinions on Griffies' ability to work were administrative findings reserved to the Commissioner. Tr. at 404.

Dr. Romano initially diagnosed Griffies with headaches, sleeping problems, depression, anxiety, and muscular pains, until eventually assessing her for fibromyalgia and referring her to Dr. Herrera in 2004. Tr. at 180-89, 236. After this referral, Dr. Romano continued to treat Griffies and filled out an RFC Questionnaire in 2006. Tr. at 327. The Questionnaire indicated that Griffies had severe physical limitations of movement. Tr. at 328. These limitations were caused by her fibromyalgia, depression, anxiety, and chronic pain. Griffies suffered from "daily pain of varying intensity, increasing with activity" and was not a "malingerer." Tr. at 327-28. Dr. Romano concluded she would miss more than four days a

month of any employment due to fibromyalgia symptoms. Tr. at 328. Dr. Romano submitted ample paperwork documenting her treatment and consistent with these determinations and continued to see Griffies, documenting symptoms of pain, depression, and anxiety at over a dozen appointments through the year 2009. Tr. at 329, 446-456. In 2009, Dr. Romano filled out the supplemental RFC Questionnaire indicating that Griffies' symptoms had not improved since 2006 and had in fact worsened.

The ALJ offered no meaningful explanation in assigning Dr. Romano's opinion "little weight." A treating physician's opinion that is supported by acceptable clinical and laboratory diagnostic techniques cannot be disregarded without contradictory medical evidence. *Fargnoli*, 247 F.3d at 42. The ALJ found that fibromyalgia, chronic pain syndrome, depression, and anxiety were "severe impairments." Tr. at 386. The ALJ disputed, however, Dr. Romano's opinion about the degree of impairment they caused. Essentially, the ALJ held the symptoms were not as bad as claimed by Griffies and her doctors.

The ALJ devalued Dr. Romano's opinion for its heavy reliance on subjective complaints. The elusive nature of fibromyalgia, and the lack of objective symptoms, however, require exactly such reliance. *Foley v. Barnhart*, 432 F. Supp. 2d 465, 476 (M.D. Pa. 2005). "[I]n a disability determination involving fibromyalgia, it is error to require objective findings when the disease itself eludes such measurement." *Id.* at 480. This leaves nothing more to evaluate than the subjective complaints made to the doctor, and unverified subjective complaints consistent with the fibromyalgia cannot be discredited for lack of objective evidence. *Id.*; *see Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003).

Moreover, in rejecting the treating physician's opinion, the ALJ must present specific contradictory evidence. *Fargnoli*, 247 F.3d at 42. Dr. Romano's opinion that Griffies suffers from severe pain and debilitating conditions is supported by her (and Dr. Herrera's) medical records reflecting years of treatment and medication. The ALJ stated that "the totality of the medical evidence shows that the claimant is not as limited as determined by Dr. Romano." This is not analysis. It is simply a conclusion. It is devoid of any references to the factual record. It provides no opportunity for meaningful judicial review and cannot be accepted. *See Burnett v. Comm'r*, 220 F.3d 112, 119-20 (3d Cir. 2000).

Finally, even if the ALJ correctly refused to give Dr. Romano's opinion controlling weight, error was committed by the failure to apply necessary factors in deciding how much weight to afford a non-controlling treating physician's opinion. *Gonzalez*, 537 F. Supp. 2d at 661. These factors are the treatment relationship, length of relationship, frequency of examination, nature and extent of the treatment relationship, supportability of the opinion afforded by the medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician. *Id.*; *See* 20 C.F.R. § 404.1527(d)(2)-(6).

In no place does the ALJ apply or consider these factors. The only analysis that touches upon these factors in any meaningful way is that the ALJ notes Dr. Romano's lack of specialization. This fact alone, however, is not the thorough evaluation required by *Gonzalez*, 537 F. Supp. 2d at 661-62 (rejecting a more complete analysis than was done in this case). Further, a general practitioner is capable of observing and treating her patient in pain, even if the doctor herself is not an expert in the disease causing the pain. Dr. Romano's opinion appears to fare well under the remaining factors, as she has an extensive treatment history with Griffies, is consistent with Dr. Herrera's opinion, and left consistent documentary evidence. It is not, however, this Court's place to analyze these factors *de novo*.

The Commissioner makes several arguments for upholding the ALJ's evaluation of Dr. Romano's opinion. The Commissioner highlights conflicts between Dr. Romano's RFC Questionnaire limiting Griffies' use of her hands with Dr. Romano's actual treatment aimed at Griffies' hands and Griffies' testimony about her hands. (D.I. 19, p.19). The Commissioner also highlights contradictions between Dr. Romano's assessment concerning Griffies' mental abilities with the assessments of the mental health professionals. (D.I. 19, pp. 19-20). The Commissioner states that Griffies' testimony concerning her ability to drive, handle her finances, and read books demonstrates objective inconsistencies with Dr. Romano's conclusions about her memory and ability to concentrate. (D.I. 19, p.20). Finally, the Commissioner argues that Dr. Romano underestimated Griffies' ability to sit, stand, and walk based on Griffies' own testimony. (D.I. 19, p. 20).

These arguments and justifications, however, are nowhere to be found in the ALJ's opinion. It is not for Commissioner to make an after-the-fact argument in support of the ALJ's decision. *Foley*, 432 F. Supp. 2d at 476. The analysis in Commissioner's brief cannot substitute for the ALJ's analysis. *Id.* Thus, these arguments can have no bearing on this Court's decision.[7] The ALJ therefore did not offer any sufficient basis for assigning Dr. Romano's opinion "little weight."

### b. The ALJ failed to consider reasonable explanations for Griffies non-pursuit of alternative treatments and did not perform a full analysis in assigning Dr. Herrera's opinion little weight.

The ALJ assigned Dr. Herrera's opinion "little weight" based on Griffies' failure to pursue the suggested "alternative treatment modalities." Tr. at 405. The ALJ held that because Griffies received only partial treatment for fibromyalgia, Dr. Herrera's opinion "does not provide an accurate understanding of the functional status of an individual fully participating in all available treatment options, which could potentially reduce her symptoms and increase her functional status." Tr. at 405.

Dr. Herrera is a rheumatologist and offered specialized treatment in fibromyalgia to Griffies. Griffies saw Dr. Herrera twenty-eight times between 2004 and 2009. Tr. at 219-46, 299-316, 432-44, 453-62. Dr. Herrera is indisputably a "treating physician" whose medical opinion deserves deference unless contradicted by other objective medical evidence. Throughout the five year treatment, the record indicates Dr. Herrera carefully evaluated Griffies' physical symptoms and mental state. *Id.* Dr. Herrera made pain assessments and consistently noted her patient's response to medication. *See, e.g.*, Tr. at 229. Dr. Herrera observed "tender points" through the body, the tell-tale objective sign of fibromyalgia, along with generalized aches and pains. Tr. at 234, 443.

In April 2006, seven months prior to the first administrative hearing, Dr. Herrera noted that the fibromyalgia was "not under control with conservative therapy." Tr. at 307. Dr. Herrera tried various treatments. She prescribed Skelaxin, Zanaflex, Cymbalta, Darvocet, Flexeril, Requip, Lipoderm patches, Mirapex, Klonopin, Effexor, Tramadol, Nortripyline, Motrin, Advil, Percocet, and Lyrica. Tr. at 307, 443.

---

[7] The Court does not express any opinion on how persuasive the analysis would be had the ALJ actually made it.

Dr. Herrera's records indicate that Griffies' pain and other symptoms did not respond to this treatment, but generally worsened over time. Tr. at 299-316. In September 2006, the same month she filled out the RFC Questionnaire, Dr. Herrera noted that Griffies rated her pain at 8/10; Griffies was "not doing well" and her symptoms were not "under control." Tr. at 299-300.

Dr. Herrera did recommend alternative medicine therapies to relieve the symptoms, including yoga, acupuncture, cognitive therapy, relaxation techniques, and massage therapy. Tr. at 316, 441, 443. While Dr. Herrera's records show Griffies was slow to adopt the alternative treatments, Griffies did attempt cognitive therapy and physical therapy. Tr. at 435. Dr. Herrera's records also show Griffies attempted some exercises but felt too much pain and fatigue to complete them. Tr. at 432.

Dr. Herrera filled out her RFC Questionnaire with full knowledge of Griffies' reluctance to embrace alternative medicine. Dr. Herrera detailed Griffies' diagnosis of fibromyalgia and noted the symptoms of pain, stiffness, myalgias, fatigue, numbness, tingling, anxiety, and depression. Tr. at 295. Like that of Dr. Romano, Dr. Herrera's Questionnaire indicated that Griffies has severe physical limitations of movement. Tr. at 296. Dr. Herrera also indicated that Griffies was "incapable of even 'low stress' jobs." Tr. at 297. Griffies was not a "malingerer." Tr. at 295. Dr. Herrera concluded she would miss more than four days a month of any employment due to symptoms of fibromyalgia. Tr. at 298. In March 2009, Dr. Herrera submitted a supplemental physician's statement that reaffirmed Griffies' condition as serious and worsening. Tr. at 478.

In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence." *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Morales*, 225 F.3d at 317-18. In addition, an ALJ is not free to substitute own "expertise" for that of a physician who presents competent medical evidence. *Plummer*, 186 F.3d at 429.

The ALJ's decision to afford little weight to Dr. Herrera's medical opinion was not made on the basis of objective medical evidence. The decision to deny great weight to a treating source opinion must

21

be supported by objective medical evidence. *Id.* Nowhere within Dr. Herrera's or any other medical opinion is there an observation or conclusion that Griffies' severe symptoms would be significantly alleviated but for her failure to more fully embrace the alternative treatments. That conclusion appears to originate solely from the ALJ's own (medical) judgment. If anything, the record reflects that Dr. Herrera believed these alternative treatments were supplemental to the aggressive traditional medical treatment already administered. Moreover, the facts indicate that Griffies attempted many, if not all, of the alternative treatments at one time or another. As detailed above, Griffies tried cognitive therapy, physical therapy, and undefined "exercises" recommended by Dr. Herrera. If the ALJ desired clarification as to which alternative therapies Griffies attempted, the ALJ should have requested it directly from Dr. Herrera. *See Foley v. Barnhart*, 432 F. Supp. 2d 465, 473 (M.D. Pa. 2005); SSR 96-5p.[8]

The ALJ's decision is generally contrary to the principle that, in cases where the plaintiff has good reason not to take prescribed medication or follow certain treatment options, the failure to do so should not be held against her. *Foley*, 432 F. Supp. 2d at 481; *Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003). While the record does not establish why Griffies did not attempt each and every of the individual treatment options,[9] it is not implausible that she had good reasons. For example, it is logical for a patient diagnosed with fibromyalgia and suffering from severe back and shoulder pain to reject yoga, an exercise based on stretching. It also resonates for a patient suffering from "tender points" to avoid massage therapy and acupuncture, treatments predicated on the application of pressure to specific points on the body. Aerobic exercises and tai chi may rightfully seem unattainable for an individual who testified that her pain is so great she often cannot get out of bed. These conclusions are supported by Dr. Herrera's statements that Griffies' pain and fatigue prohibited completion of some of the exercises. Tr. at 432, 435. It is thus apparent that Griffies might have had good reason not to follow at least some of the

---

[8] Social Security Ruling 96-5p states in pertinent part: "[b]ecause treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicatory must make 'every reasonable effort' to recontact the source for clarification of the reasoning of the opinion."
[9] It seems worth noting that she was prescribed at least fifteen different drugs. It does not seem reasonable to conclude that a claimant who tries every drug prescribed and three different therapies would be able to work if only

suggested treatment options. As to the record's silence on individual alternative treatments, the ALJ should not have used that to discredit Dr. Herrera's opinion without evidence in the record showing that she had no good reason to reject the alternative treatment suggestions.

Even had Griffies' aversion to alternative treatments counted as objective contradictory medical evidence, thus making Dr. Herrera's opinion non-controlling, the ALJ failed to apply the factors an ALJ must consider in deciding how much weight to accord a non-controlling treating physician's opinion. *Gonzalez*, 537 F. Supp. 2d at 661. These factors (again) are the treatment relationship, length of relationship, frequency of examination, nature and extent of the treatment relationship, supportability of the opinion afforded by the medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician. *Id.*; *See* 20 C.F.R. § 404.1527(d)(2)-(6). The ALJ does not apply or cite any of these factors (other than Dr. Herrera's specialty in rheumatology.) Dr. Herrera generated extensive documentary evidence of her treatment, and her opinions appear to be generally consistent with those of Dr. Romano.

The Commissioner makes essentially the same arguments for upholding the ALJ's assignment of little weight to Dr. Herrera's opinion as the Commissioner did in relation to the ALJ's treatment of Dr. Romano's opinion. Just as the analysis in the Commissioner's brief cannot substitute for the analysis the ALJ needed to make in relation to Dr. Romano's opinions, so too it cannot act as a substitute for the missing analysis concerning Dr. Herrera's opinions. Therefore, the ALJ did not offer any sufficient basis for assigning Dr. Herrera's opinions "little weight."

### c. The ALJ erred in assigning "great weight" to Dr. Borek's assessment

The ALJ assigned great weight to Dr. Borek's opinion and supplied the following rationale: "Dr. Borek's opinion is consistent with the medical record as a whole, which reflects that the claimant can perform light work with additional limitations." Tr. at 405. This is not an adequate explanation. Social security regulations require more rigorous tests for weighing opinions as the ties between the source of

---

she had tried a nineteenth different option.

23

the opinion and the individual become weaker. *See Gonzalez*, 537 F. Supp. 2d at 663; S.S.R. 96-6p. In

particular, the opinions themselves must take into account and explain all of the other evidence in the

record, including the opinions of treating physicians. The regulations stress this point with the following:

> [B]ecause nonexamining sources have no examining or treating relationship with you, the
> weight we will give their opinions will depend on the degree to which they provide
> supporting explanations for their opinions. We will evaluate the degree to which these
> opinions consider all of the pertinent evidence in your claim, including the opinions of
> treating and other examining sources.

20 C.F.R. § 416.927; *Gonzalez*, 537 F. Supp 2d at 663. Dr. Borek's assessment concluded that

Griffies' limitations were less severe than opined by her treating physicians; her capabilities were

consistent with an ability to do light and sedentary work. Tr. at 275-277. This assessment was

made in September 2005 and never updated. Tr. at 283. The record contains over three years of

medical documentation supplied by Dr. Herrera, Dr. Romano, and others subsequent to Dr.

Borek's assessment. The ALJ never addressed the staleness of Dr. Borek's conclusions. The ALJ

never requested a supplemental assessment accounting for these years of treatment, Dr. Borek's

opinion is outdated and is not supported by substantial evidence. Non-treating sources should be

"evaluated to the degree to which these opinions consider all of the pertinent evidence in [the]

claim." In *Barnhart*, the court overruled the ALJ's crediting of a non-treating physician's report

in a fibromyalgia claim. 432 F. Supp. 2d at 476. The court held that the ALJ could not rely on the

non-treating physician's report when it was four years old at the time of the ALJ's decision and

the record showed the disease progressed after the report was made. *Id.* The facts here are

analogous. Dr. Borek's assessment failed to take into account the progressive deterioration of

Griffies' condition as documented by her treating physicians. It did not sufficiently "consider all

of the pertinent evidence." 20 C.F.R § 416.927. It was thus error for the ALJ to assign "great

weight" to Dr. Borek's opinion.[10]

---

[10] In addition, the ALJ's explanation for crediting Dr. Borek's opinion was one sentence. "[It] is consistent with the
medical record as a whole, which reflects that the claimant can perform light work with additional limitations." Tr.
at 405. Since the primary basis for saying that Griffies could "perform light work with additional limitations" was

### 3. The ALJ's reasoning for assigning little weight to Griffies' subjective complaints are inconsistent with the record.

Griffies argues that the ALJ should have given greater credit to her subjective complaints. Social Security regulations establish a two-part process an ALJ must follow when assessing subjective symptoms. First, an ALJ must identify "medical signs and laboratory findings which show that [a plaintiff has] a medical impairment which could reasonably be expected to produce the pain . . .alleged." 20 C.F.R. § 404.1529(a); *Hartfani v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). Conversely, a "statement about [her] pain or other symptoms will not establish [she is] disabled." 20 C.F.R. Sec. 404.1529(a). These statements must be given serious consideration, but must also be "consistent with medical signs and laboratory findings." *Id.*

If the ALJ finds objective medical evidence, the ALJ must evaluate the nature and persistence of the subjective symptoms. 20 C.F.R. Sec. 404.1529(c)(1). Fibromyalgia is a disease that often lacks objective evidence, making the subjective complaints of a claimant especially important to the disability determination. *Foley*, 432 F. Supp. 2d at 480. When a doctor has in fact diagnosed fibromyalgia, the claimant's subjective complaints receive a boost of credibility. *Id.* Of course, an ALJ need not unquestioningly accept a plaintiff's assertions as to the nature and persistence of pain, and may reject a claimant's testimony if the ALJ does not find it credible, so long as the reasons for the ALJ's determination are grounded in the evidence. *Hartranft,* 181 F.3d at 632.

Because the ALJ found objective evidence of fibromyalgia, there is no dispute as to whether medical signs and laboratory findings show that Griffies had a medical impairment. The Commissioner argues the ALJ was justified in denying Griffies credibility based on alleged inconsistent statements Griffies made during the first administrative hearing. The ALJ stated that "the claimant's reports of pain are not consistent with the medical record as a whole." Tr. at 398. She based this conclusion on the perceived inconsistencies between Griffies' testimony and the medical reports. *Id.* These inconsistencies

Dr. Borek's opinion, the explanation makes little sense.

do not exist, and, recognizing that it is the ALJ's province to determine credibility, the ALJ had no basis

for her conclusion.

The ALJ stated that "from July 7, 2004 to May 24, 2006, aside from two days...the claimant's

pain generally ranged from 1 to 5 out of 10. These pain ranges demonstrate that the claimant's pain has

been controlled on her treatment plan for at least a portion of the relevant period and is in sharp contrast

to the claimant's testimony indicating that her pain measured 7 to 8 out of 10 since 2004." Tr. at 399.

The testimony in dispute is as follows:

Q: And when you take your medication, what number would you assign to your
fibromyalgia pain, one, no pain on the pain scale, ten, worse, what number would you
use?
A: Between a seven and eight.
Q: And you have told your doctor that, and what does the doctor say?
A: Yes, she just keeps trying to find different medication to help, so far we haven't found
anything.
Q: Now you've been having treatment since approximately '04. Would you say that
treatment has made your symptoms generally better, generally worse, generally the same,
how would you express that?
A: They're the same.
Q: So the treatment has not helped?
A: No.

Tr. at 55-56 (testimony on December 7, 2006). The ALJ's conclusion that Griffies' testimony is

inconsistent with the medical evidence is flawed. Griffies indeed testified that her pain is "between a

seven and eight."[11] After the ALJ noted that treatment began in 2004, the ALJ asked if the treatment was

helping her symptoms, making her symptoms worse, or if her symptoms were the same. Griffies

responded, "they're the same." This harmed Griffies' credibility in the eyes if the ALJ. The ALJ

interpreted this response to mean that Griffies' pain was steadily "between a seven and eight" since the

she began treatment. Had this been Griffies' actual testimony, the ALJ would have had a factual basis to

doubt Griffies' credibility, as the medical record amply documents the fluctuating nature of Griffies'

repeated pain and symptoms since 2004. Griffies, however, did not testify that her pain was the same

since 2004. This was not the question she was asked. The question asked can be boiled down to, "Has the

---

[11] The time period is indeterminate, but suggests "at the present time," which was 2006 at the time of the question.

treatment generally made a difference in your symptoms?"[12] Griffies answered that it had not, *i.e.*, her

symptoms were generally the same as they would have been without treatment. This testimony is

consistent with the record. Tr. at 295, 309, 316, 435, 443, 454, and 461. The medical evidence is replete

with her doctors noting the ineffectiveness of the many different medications administered to Griffies. *Id.*

The medical records show that her symptoms had actually worsened since she began treatment in 2004,

despite a general escalation in treatment over time. *Id.* The testimony that her symptoms were generally

not helped by the treatment is consistent with her doctors' conclusions that her fibromyalgia was

uncontrolled by treatment and that the medications were ineffective. Moreover, the testimony rating her

pain as between a seven and eight at the time of testimony is corroborated by Dr. Herrera's September

2006 patient report. Tr. at 299. August had the same rating, and June was rated at 7/10. Tr. at 301, 333.

The ALJ lacked justification grounded in the evidence to discredit Griffies' testimony. *Hartranft,* 181

F.3d at 632.

### 4. The ALJ improperly evaluated the report of Griffies' treating psychologist.

The ALJ found that Griffies suffered from the severe impairments of depression and anxiety, but

that her symptoms were not disabling. In making this conclusion, the ALJ assigned little weight to the

opinion of Griffies' treating psychologist, Dr. Keyes. Tr. at 404. Dr. Keyes diagnosed Griffies with

"major depression disorder recurrent chronic, moderate to severe." Dr. Keyes rated Griffies as severely

impaired in her ability to relate with others, moderately impaired in her ability to perform routine and

repetitive tasks, moderately impaired in sustaining work performance and attendance, and mildly

impaired in her ability to carry out instructions. Tr. at 255-56. The ALJ's assignment of little weight was

based on the following:

> [W]hen the claimant was examined by Dr. Keyes she was in the middle of a divorce
> action yet remained living with her putative ex-husband, Mr. Griffies, at the time Dr.
> Keyes examined her. Further, she was not undergoing professional mental health
> treatment at the time. Dr. Keyes' opinion reflects the status of an under treated individual

---

[12] The question asked about symptoms, not pain. Fibromyalgia can cause multiple symptoms, for example, stiffness, fatigue, numbness, tingling, and depression, all of which Griffies exhibited. Tr. at 295.

at the time he performed his examination. His opinion does not reflect the claimant's potential when participating in therapy and medication management supervised by professionals on an ongoing basis.

Tr. at 404. An ALJ may reject a treating physician's opinion "only on the basis of contradictory medical evidence." *Morales*, 225 F.3d at, 31. That opinion may not be rejected for no reason or the wrong reason. *Id.* at 317. When there is contradictory medical evidence, the ALJ must still carefully evaluate how much weight to give the treating physician's opinion and provide an explanation as to why the opinion is not given controlling weight. *Gonzalez*, 537 F. Supp. 2d at 660. In choosing to reject the Dr. Keyes' assessment, an ALJ may not make "speculative inferences from medical reports" and may reject the "treating physician's opinion outright only on the basis of contradictory medical evidence." *Plummer*, 186 F.3d at 429.

The ALJ was not qualified to substitute her own theories about the medical causes underlying Griffies' depression. The conclusion that Griffies' divorce was a root cause of Griffies' depression is not present in Dr. Keyes' opinion. Tr. at 254. The medical judgment that Griffies' relational status rendered her depression symptoms temporary is one made completely of the ALJ's own accord and is not supported by any objective medical evidence in the record. Moreover, Griffies' depression was repeatedly noted as severe during her treatments with both Dr. Herrera and Dr. Romano. As the ALJ based the weight given to Dr. Keyes' opinion through the lens of her psychological judgment, her decision regarding Griffies' depression is not based on substantial evidence. *Id.*

The ALJ also considered the opinion of Dr. King, a DDS physician who conducted a Psychological Residual Functional Capacity Assessment. Tr. at 403. The ALJ assigned weight to the portion of his opinion finding Griffies moderately limited in social functioning, maintaining concentration, persistence and pace, and that she could perform simple, repetitive tasks. *Id.* On the other hand, the ALJ assigned little weight to the part of his opinion regarding Griffies' limitations in her activities of daily living, as Dr. King did not thoroughly consider Griffies' subjective complaints. *Id.*

28

The court finds substantial evidence for the ALJ's conclusions about Dr. King's opinion. Dr. King's findings that Griffies was moderately limited in her social functioning, maintenance of concentration, persistence, and pace is consistent with Dr. Keyes' conclusions that Griffies was socially withdrawn and "moderately impaired in sustaining work performance." Tr. at 253, 267-71. The ALJ's decision to not credit Dr. King's findings regarding his opinion that Griffies had no limitations in her activities of daily living is supported by substantial evidence and is not challenged by the Commissioner.

### 5. The Vocational Expert

Griffies attacks the vocational expert's determination that she is capable of light, sedentary work existing in sufficient numbers in the national and local economies. The essence of this challenge is that the vocational expert's testimony was based on the ALJ's hypothetical, and the hypothetical did not conform to the facts. There is no need to address this argument. If there is a third administrative hearing, it will have a different record, and there will need to be new testimony from a vocational expert. Because this matter is being remanded with new instructions to the ALJ concerning the medical record, and the ALJ may reach different conclusions as to the degree of impairment, there is no need to analyze the vocational expert's conclusion in connection with the earlier proceedings. Analyzing the vocational expert's 2006 testimony would simply be an academic exercise.

## IV. CONCLUSION

For the reasons discussed above, Griffies' motion for summary judgment is granted. The Commissioner's motion for summary judgment is denied. The case is remanded for a disability determination consistent with this opinion. Griffies requests that this Court grant her benefits. The Court acknowledges that it has now been seven years since she first applied for benefits. While this Court is confident that the Commissioner has thus far denied benefits without demonstrating that the Commissioner has a basis for doing so, the Court is not so confident that the only possible correct conclusion is that the Plaintiff must be awarded benefits. The Court is mindful that the Commissioner is a

public servant with great responsibility. The Court respectfully requests that the Commissioner expedite

the consideration of this case upon remand.